Henk v. SSA                    CV-97-100-M    03/06/98

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Brenda Henk,
    Plaintiff,

    v.                                    Civil No. 97-100-M

Kenneth S. Apfel, Commissioner
Social Security Administration,
    Defendant.


**O R D E R**

Pursuant to 42 U.S.C. § 405(g), plaintiff, Brenda L. Henk, moves to reverse the Commissioner's decision denying her application for Social Security Disability Insurance Benefits provided under Title II of the Social Security Act, 42 U.S.C. § 423.  Defendant objects and moves for an order affirming the decision of the Commissioner.


I.   **Procedural History**

Plaintiff initially filed an application for disability insurance benefits on August 24, 1990, alleging disability due primarily to chondromalacia patella[1] of both knees.  Plaintiff and a vocational expert testified before an administrative law judge ("ALJ") on November 13, 1991.  On December 26, 1991, the ALJ issued an order denying plaintiff's application for benefits. The Appeals Council denied plaintiff's request for review on

---

[1]  A degeneration of the cartilage of the patella (kneecap), in which the margins of the patella become tender, and there is pain when the patella is pressed against the femur (thighbone). Dorland's Illustrated Medical Dictionary (27th ed. 1988).

November 17, 1992.  She appealed to this court, which denied her motion to reverse the decision of the Commissioner.  Henk v. Commissioner, No. 93-11-M, slip op. (D.N.H. March 25, 1994).  The court did, however, note that "[p]laintiff is of course entitled to, and probably will, reapply for benefits based on a further degeneration of her condition which may result in a disability arising during a period of insured status subsequent to that reviewed here."  Id., at 18.

In light of the disposition of plaintiff's earlier application, the parties agree that "the time period adjudicated by these prior proceedings, up through and including December 26, 1991, is res judicata."  Joint Statement of Material Facts, at 2.  And, because plaintiff's insured status expired on March 31, 1993, the relevant period of inquiry is between those two dates.

Nevertheless, in order to gain a longitudinal view of plaintiff's condition, a brief discussion of her medical history is appropriate.  The record from plaintiff's prior application reveals that she underwent six surgical procedures on her right knee due to chondromalacia, a spur, and arthritis (as of her most recent hearing, she had undergone three additional operations).  Plaintiff's surgeon, Dr. Hodge, also diagnosed her with reflex sympathetic dystrophy of the right knee.  Dr. Hodge recommended extended physical therapy for up to five years and opined that plaintiff suffered from a 65% impairment of the whole body.

2

Subsequently, Dr. Hodge referred plaintiff to Dr. Kleeman, who opined that she suffered from a 20% impairment of the whole body.

In addition to arthritis and chondromalacia, plaintiff also experiences allergic reactions (some of which are quite severe) to many of the pain medications which have been prescribed for her. Accordingly, she has sought relief from her pain through physical therapy, ultrasound, heat message, a knee immobilizer, a special cane, and a Tedd's stocking.

On May 19, 1994, plaintiff filed a second application for disability insurance benefits. ALJ Robert Klingebiel conducted a hearing on February 15, 1995, at which plaintiff appeared and was represented by counsel. Both plaintiff and her husband testified. On July 28, 1995, the ALJ issued an order denying plaintiff's application for benefits. The Appeals Council subsequently denied plaintiff's request for review and plaintiff filed the instant appeal.

## Stipulated Facts

Pursuant to this court's local rule 9.1(d), the parties have submitted a statement of stipulated facts. Because of plaintiff's substantial medical history and the sizeable number of facts the parties deem relevant to this proceeding, the court has incorporated the parties' stipulation as an appendix to this opinion. Where appropriate, the court has included reference to

factual allegations set forth in plaintiff's supplemental counter statement of material facts (document no. 12), provided those allegations are supported in the record.

## Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary [now, the "Commissioner"], with or without remanding the cause for a rehearing."  Factual findings of the Commissioner are conclusive if supported by substantial evidence.  42 U.S.C. §§ 405(g), 1383(c)(3); Irlanda Ortiz v. Secretary of Health and Human Services, 955 F.2d 765, 769 (1st Cir. 1991).[2]

In making factual findings, the Commissioner must weigh and resolve conflicts in the evidence.  Burgos Lopez v. Secretary of Health & Human Services, 747 F.2d 37, 40 (1st Cir. 1984) (citing Sitar v. Schweiker, 671 F.2d 19, 22 (1st Cir. 1982)).  It is "the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the

_____

[2]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  It is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.  Consolo v. Federal Maritime Comm'n., 383 U.S. 607, 620 (1966).

4

[Commissioner] not the courts." Ortiz, 955 F.2d at 769. Accordingly, the court will give deference to the ALJ's credibility determinations, particularly where those determinations are supported by specific findings. Frustaglia v. Secretary of Health & Human Services, 829 F.2d 192, 195 (1st Cir. 1987) (citing Da Rosa v. Secretary of Health and Human Services, 803 F.2d 24, 26 (1st Cir. 1986)).

An individual seeking Social Security disability benefits is disabled under the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A). The Act places a heavy initial burden on the plaintiff to establish the existence of a disabling impairment. Bowen v. Yuckert, 482 U.S. 137, 146-47 (1987); Santiago v. Secretary of Health and Human Services, 944 F.2d 1, 5 (1st Cir. 1991). To satisfy that burden, the plaintiff must prove that her impairment prevents her from performing her former type of work. Gray v. Heckler, 760 F.2d 369, 371 (1st Cir. 1985) (citing Goodermote v. Secretary of Health and Human Services, 690 F.2d 5, 7 (1st Cir. 1982)). Nevertheless, the plaintiff is not required to establish a doubt-free claim. The initial burden is satisfied by the usual civil standard: a "preponderance of the evidence." See Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982).

5

In assessing a disability claim, the Commissioner considers objective and subjective factors, including: (1) objective medical facts; (2) the plaintiff's subjective claims of pain and disability as supported by the testimony of the plaintiff or other witnesses; and (3) the plaintiff's educational background, age, and work experience.  See, e.g., Avery v. Secretary of Health and Human Services, 797 F.2d 19, 23 (1st Cir. 1986); Goodermote, 690 F.2d at 6.

Once the plaintiff has shown an inability to perform her previous work, the burden shifts to the Commissioner to show that there are other jobs in the national economy that she can perform.  Vazquez v. Secretary of Health and Human Services, 683 F.2d 1, 2 (1st Cir. 1982).  If the Commissioner shows the existence of other jobs which the plaintiff can perform, then the overall burden remains with the plaintiff.  Hernandez v. Weinberger, 493 F.2d 1120, 1123 (1st Cir. 1974); Benko v. Schweiker, 551 F. Supp. 698, 701 (D.N.H. 1982).

When determining whether a plaintiff is disabled, the ALJ is required to make the following five inquiries:

(1)  whether the plaintiff is engaged in substantial gainful activity;

(2)  whether the plaintiff has a severe impairment;

(3)  whether the impairment meets or equals a listed impairment;

(4)    whether the impairment prevents the plaintiff from
       performing past relevant work; and

(5)    whether the impairment prevents the plaintiff from
       doing any other work.

20 C.F.R. § 404.1520.  Ultimately, a plaintiff is disabled only

if her:

> physical or mental impairment or impairments are of
> such severity that [she] is not only unable to do [her]
> previous work but cannot, considering [her] age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2)(A).


With those principles in mind, the court reviews plaintiff's

motion to reverse the decision of the Commissioner.


**DISCUSSION**

A.    Background.

In concluding that Ms. Henk was not disabled within the

meaning of the Act, the ALJ employed the mandatory five-step

sequential evaluation process set forth in 20 C.F.R. § 404.1520.

Step 4 of the evaluation process requires the ALJ to determine

whether, despite the plaintiff's impairment, she retains the

residual functional capacity ("RFC") to perform her past relevant

work.  At step 4, the ALJ determined that plaintiff's RFC

permitted her to perform, at a minimum, "the exertional and

nonexertional requirements of light work, except for standing

7

more than 45 minutes, walking more than one-half mile at a time and performing extensive climbing, bending and stooping."[3] (Tr. 20) In light of that finding, the ALJ concluded that plaintiff could perform her past relevant work as a receptionist and held that she was not disabled within the meaning of the Social Security Act. (Tr. 20-21) Plaintiff claims that the ALJ erred in assessing the credibility of her claim that her pain was sufficiently extreme to be disabling. She also argues that the ALJ failed to explain the basis for his decision with sufficient particularity.

B.    Assessing Plaintiff's Complaints of Pain.

The ALJ is required to consider subjective complaints of pain or other symptoms by a plaintiff who presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged." 42 U.S.C. § 423(d)(5)(A); Avery v. Secretary of Health and Human Services, 797 F.2d 19, 21 (1st Cir. 1986); 20 C.F.R. § 404.1529. "[C]omplaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health and Human Services, 869 F.2d 622, 623 (1st Cir. 1989); see Bianchi v. Secretary of Health and Human Services, 764 F.2d 44,

---

[3] The ALJ's order is somewhat unclear insofar as it repeatedly references plaintiff's ability to perform sedentary work, see, e.g., Tr. 17-19, yet in the end concludes that she is capable of performing light work. It is also unclear whether the ALJ concluded that plaintiff's prior employment as a receptionist required work at a light or sedentary level.

45 (1st Cir. 1985) ("The [Commissioner] is not required to take the plaintiff's assertions of pain at face value.") (quoting Burgos Lopez v. Secretary of Health and Human Services, 747 F.2d 37, 40 (1st Cir. 1984)). Once a medically determinable impairment is documented, the effects of pain must be considered at each step of the sequential evaluation process. 20 C.F.R. § 404.1529(d).

A plaintiff's medical history and the objective medical evidence are considered reliable indicators from which the ALJ may draw reasonable conclusions regarding the intensity and persistence of the plaintiff's pain. Avery, 797 F.2d at 23; 20 C.F.R. § 404.1529(c)(3). However, situations exist in which the reported symptoms of pain suggest greater functional restrictions than can be demonstrated by the medical evidence alone. Id.

When, as here, a plaintiff complains that pain or other subjective symptoms are a significant factor limiting her ability to work, and those complaints are not fully supported by medical evidence contained in the record, the ALJ must consider additional evidence, such as the plaintiff's prior work record; daily activities; location, duration, frequency, and intensity of pain; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, past or present; treatment, other than medication, received for relief of pain or other

9

symptoms, past or present; any measures used, past or present, to relieve pain or other symptoms; and other factors concerning functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); Avery, 797 F.2d at 23. If the complaints of pain are found to be credible under the criteria, the pain will be determined to diminish the plaintiff's capacity to work. 42 U.S.C. § 423(d); 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ concluded that "[t]he record shows no objective basis for limitations in sitting and [plaintiff's] complaints in this regard have been found wanting." (TR. 19) Ultimately, the ALJ concluded that plaintiff's "testimony and allegations regarding subjective complaints, including pain, are not generally credible." (Tr. 20) In support of that conclusion, the ALJ noted that: (1) despite plaintiff's claim that she could not sit for prolonged periods, her physicians did not recommend any specific limitations with regard to sitting; (2) neither Dr. Hodge nor Dr. Kleeman affirmatively stated that plaintiff was unable to work as a result of her condition; and (3) her daily activities suggested that her functional limitations due to pain were exaggerated. (Tr. 17) With regard to the latter factor, the ALJ observed that plaintiff was able to drive her daughter to and from school each day, sit for a couple of hours in the library of her daughter's school one morning each week, act as the president of a social club, and conduct

10

educational programs roughly once each month for the Animal Rescue League. (TR. 17)

While the ALJ's credibility determination is entitled to deference, it must be supported by specific factual findings which are, in turn, supported by the record. Here, however, the ALJ's credibility determination is not adequately grounded in the record insofar as it appears that the ALJ failed to give sufficient consideration to the factors outlined in 20 C.F.R. § 404.1529(c)(3) and <u>Avery</u> (e.g., effectiveness, side effects, and dosage of pain medications; any measures used to relieve pain; duration, frequency, and intensity of pain; etc.).

The parties agree that plaintiff's medical condition is one that can, and in fact does, cause her pain. They disagree with regard to the extent of that pain and whether it is disabling. Plainly, the ALJ concluded that plaintiff's complaints of pain were exaggerated and did not preclude her from performing her past relevant work. However, for this court to sustain that conclusion, the ALJ must properly document those factors in the record upon which he relies in reaching that conclusion. <u>See, e.g.,</u> <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995) ("Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, findings as to credibility should be closely and affirmatively linked to

11

substantial evidence and not just a conclusion in the guise of findings.") (citations and internal quotation marks omitted).

After carefully reviewing the record and, in particular, the ALJ's stated bases for his resolution of this matter, the court concludes that his findings are not supported by substantial evidence. The ALJ did not address the following issues, or evidence that seems particularly relevant:

1.  Despite plaintiff's apparent willingness to work (there being nothing to the contrary in the record), she was unable to perform any work on a sustained basis.

2.  Plaintiff's daily activities (although modest to begin with), declined toward the latter stages of her period of insured status (she says because her pain became more disabling).

3.  With regard to activities such as driving her daughter to school, the ALJ's order does not address whether plaintiff performed those activities as a matter of necessity or in response to "extraordinary circumstances." See, e.g., Ranlet v. Secretary, No. 95-155-M, slip op. at 13 (D.N.H. March 19, 1996) ("implicit in the inquiry into a claimant's daily regimen is the notion that the daily activities used in the credibility calculus are ones which reasonably reflect the claimant's condition. Accordingly, activities necessarily undertaken in response to extraordinary circumstances -- particularly when performed inadequately or with extreme pain -- cannot be considered reliable indicators of an individual's ability to function with pain under the Avery analysis."); see also Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989).

4.  The ALJ's order also does not address the fact that both Dr. Finn (plaintiff's treating psychologist) and Dr. Beasley (one of the many physicians who treated plaintiff) advised plaintiff that she should, to the extent she was physically able, attempt to maintain her limited activities in the community to help alleviate psychological feelings of helplessness and low self-esteem which flowed from her disability.

5.   Plaintiff's husband testified that following her surgery in 1990, she dramatically reduced her activities both outside the home and at home. See, e.g., Transcript at 38 ("[W]e couldn't do as many things as a family, vacations, activities. We had to do more things to help her because she couldn't go up the stairs or shopping. We do more shopping, more cooking, more laundry, more things that she couldn't quite do. . ..").

6.   Plaintiff has undergone nine separate surgical procedures, repeatedly describing her pain to treating physicians as "severe" (Tr. 168), "burning" and "sharp" (Tr. 321), "intense" (Tr. 353), and "excruciating" (Tr. 425). She also testified that her pain was sufficiently great to interfere with her sleep pattern, which testimony was supported by her husband, who testified that as early as 1991, he and plaintiff began sleeping on a downstairs couch on those occasions when plaintiff's pain was particularly debilitating, so she would not have to negotiate the stairs to their second-floor bedroom. (TR. 41-42)

7.   Because plaintiff suffers from numerous allergies (including allergies to opiates and most anti-arthritic medications) she has been unable to maintain any effective medical pain-killing regimen. The record establishes that her allergies are so severe that, on occasion, she required local emergency room treatment because she was coughing up blood. Plaintiff's reaction to some of her pain medications also apparently caused her to sustain liver and/or pancreatic dysfunction. Nevertheless, the record shows that she continued to search for some medication (or combination of medications) which would alleviate her pain without causing additional discomfort or organ damage. In the end, it appears that the record establishes that plaintiff has been unable, despite repeated and sustained efforts, to arrive at an effective medical treatment for her pain.

While the ALJ likely considered those and other factors in reaching his conclusions, the administrative order fails to address them (in a way that would permit the court to identify what substantial evidence of record supports the finding of no disability). Consequently, the court is constrained to hold that

13

the ALJ's conclusion that plaintiff is not disabled is not supported by substantial evidence, since absent references to evidence the court might be overlooking, the record appears to support the contention that plaintiff is disabled.

For example, although the ALJ cited plaintiff's participation in the Junior Women's Club as evidence of her residual functional capacity, he makes no reference to a letter from one of plaintiff's friends who represented that plaintiff's position as president of that club required little, if any, physical activity or exertion; that the club's projects "nearly ran themselves;" and that club meetings were sometimes held in plaintiff's home if she was not feeling well or was unable to leave the house. (Tr. 478) No other evidence of record appears to be contrary, so participation in the Junior Women's Club on an occasional basis does not seem to be particularly probative of anything. Nor does the ALJ reference plaintiff's statement that her participation in that organization had "completely ceased" by May of 1992 at the latest. (Tr. 36, 43)

Similarly, there is a letter in the record from plaintiff's dentist, Dr. Ronald Szopa, who stated that, beginning in 1991, plaintiff experienced severe dental problems, which were probably the result of prolonged clenching of her teeth in response to pain in her knees. (Tr. 476-77) That evidence might be seen as corroborating claimant's assertion that her pain was both long-

14

lasting and, at least at times, intense.  See 20 C.F.R. § 404.1529(c)(3)(ii).  The letter is not discussed in the administrative order, though it could not have been overlooked.

In the end, the factors mentioned above and the absence of discussion of their import in the ALJ's order, and a pervasive sense from the record that something is amiss, all counsel in favor of remanding this case.

To carry her burden, and establish that she is disabled, plaintiff need not demonstrate that she is an invalid or that she has been reduced to a completely sedentary lifestyle.  Murdaugh v. Secretary, 837 F.2d 99, 102 (2d Cir. 1988).  In a recent opinion, the Court of Appeals for the Eight Circuit emphasized this point, noting that:

> In discrediting [claimant's] pain, the ALJ also pointed to her daily activities: making her bed, preparing food, performing light housecleaning, grocery shopping, knitting, crocheting, and visiting friends.  The ALJ asserts that these activities "demonstrate an ability to meet the physical demands of work which does not involve prolonged sitting or standing."  We have repeatedly held, however, that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."  To establish disability, [claimant] need not prove that her pain precludes all productive activity and confines her to life in front of the television.

Baumgarten v. Chater, 75 F.3d 366, 369 (8th Cir. 1996) (citations omitted).  See also 20 C.F.R. §§ 404.1572(c) (suggesting that taking care of oneself, performing household tasks or hobbies,

15

attending school, and participating in club activities or social programs are generally not, without more, evidence of a claimant's ability to engage in substantial gainful activity). On this record, it appears that the ALJ rested his ultimate conclusion largely upon such factors; perhaps not, but the analysis provided and review of the record leave the court persuaded that the administrative decision is not supported by substantial evidence.

## Conclusion

The ALJ's conclusion that Ms. Henk is not disabled within the meaning of the Act is not supported by substantial evidence. Specifically, the ALJ's conclusion that plaintiff's subjective complaints of pain are not credible is tainted because the ALJ's order fails to address particularly relevant evidence and factual issues in the record in reaching that conclusion, which conclusion seems to be against the weight of the record evidence. See, e.g., Avery, 797 F.2d at 23. See also 20 C.F.R. § 404.1529(c)(3) (outlining the factors an ALJ should consider when assessing whether a claimant's pain is a significant factor limiting his or her ability to work).

Absent discussion of those factors, the ALJ's order cannot stand. To be sure, in cases where evidence of a plaintiff's pain is minimal, detailed discussion of such factors may not be necessary to justify the conclusion that the plaintiff's

16

complaints of pain are exaggerated.  However, in cases such as this, where the record contains substantial evidence of plaintiff's pain, the ALJ should support his judgment that she is overstating the magnitude of her pain and is capable of performing her past relevant work with specific reference to evidence or relevant factors leading to that conclusion.  This court must have a relatively firm foundation upon which to rest its deference to the finder of fact.  While perhaps a close case, the court is constrained to conclude that it cannot, based upon the record as it presently stands, defer to the ALJ's factual conclusion that plaintiff is not disabled.

Plaintiff's motion to reverse the decision of the Commissioner (document no. 6) is granted.  The Commissioner's motion to affirm the decision of the Commissioner (document no. 11) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 6, 1998

cc:  David L. Broderick, Esq.
     Raymond J. Kelly, Esq.

17

**Appendix**

The Parties' Joint Statement
of Material Facts

A.    Work Background And Medical History

The plaintiff, Brenda Henk, was born on January 1, 1955, and was 40 years old on the date of her hearing (Tr. 272). She had a high school equivalency degree (Tr. 236) and a work history covering most of the years between 1972 and 1989 (Tr. 309-310). Her past relevant work included jobs as a receptionist, a bartender, a restaurant hostess, and an administrative secretary (Tr. 255-256, 458).

Plaintiff alleges disability based on bilateral knee conditions and sympathetic reflex dystrophy beginning May 1989 (Tr. 301). The evidence of record confirms that the plaintiff has not performed gainful activity after that time. However, the plaintiff did file a previous application in this case, based on essentially the same conditions and the same onset date (Tr. 88-90, 123). This application was denied initially, on reconsideration, by an Administrative Law Judge following a hearing, and by the District Court for the District of New Hampshire on appeal (Tr. 103-104, 116-118, 222-229). Thus the time period adjudicated by these prior proceedings, up through and including December 26, 1991, in res judicata.[4] Another date

_____

[4] The medical evidence and testimony dated from this period may be viewed in an abbreviated fashion for purposes of establishing a longitudinal view of the plaintiff's conditions, Social Security Ruling 96-7p. In this case, the medical evidence from the prior application shows that the plaintiff underwent six

18

pertinent to the current application is the expiration of the plaintiff's insured status. Here the plaintiff is insured up through March 31, 1993, but not thereafter. Thus, the relevant period in this case is from December 27, 1991 to March 31, 1993.

### Evidence During the Relevant Period Presented At the Second ALJ Hearing on February 15, 1995

The earliest evidence following the beginning of the relevant period is dated August 1992, at which time Dr. Kleeman

---

surgical procedures on her right knee due to chondomalacia, a spur, and arthritis (Tr. 143, 150, 157-159, 162-176, 186-198). These were performed by Dr. Kleeman, an orthopedic surgeon. Plaintiff was also diagnosed with reflex sympathetic dystrophy of the right knee by Dr. Hodge, a surgeon (Tr. 320, 322). Dr. Hodge recommended extended physical therapy of up to 5 years and rated the plaintiff with a 65% impairment of the whole body (Tr. 220). Dr. Kleeman rated the plaintiff with a 20% impairment of the whole body (Tr. 313).

Also during this period, the plaintiff did attend and testify at a hearing before an ALJ (Tr. 235-263). Plaintiff's testimony indicated that she had experienced knee pain since 1984 and had undergone many surgeries for this condition (Tr. 237-238, 240-241). Plaintiff alleged that her limitations from her knee condition included pain and swelling (Tr. 242). According to the plaintiff, her swelling and pain became more severe if she was not able to elevate her legs (Tr. 253). Plaintiff estimated that she could perform 3-4 hours of activity a day. This included standing for ½ hour increments, up to 4 hours total. The plaintiff did not believe that she could perform prolonged sitting (Tr. 242, 247, 252). Plaintiff further testified that she would fall unexpectedly while standing in one position (Tr. 247).

Moreover, plaintiff stated that she had been prescribed many pain medications, but that she had suffered allergies to most of these medications, in the form of gastrointestinal difficulties and rashes (Tr. 243). She also noted that she had employed other methods to reduce the pain and swelling in her knees, including physical therapy, ultrasound, heat massage, a TENS unit, knee immobilizer, special cane and Tedd's stocking. Plaintiff testified that these methods had provided little, if any, relief.

19

again saw the plaintiff after she started experiencing back pain (Tr. 316). She complained of the pain radiating slightly to the right side (Tr. 316). She also reported she tried to perform some temporary work but had to go back to physical therapy for her knee (Tr. 316). Plaintiff stated that her functional ability was limited to sitting or standing for 45 minutes and walking about a half mile (Tr. 316). She was not taking any pain medication because of her physical intolerance to non-steroidals (Tr. 316).

Dr. Kleeman's examination found that the plaintiff's strength, reflexes, and sensation were all normal (Tr. 316). Additionally, the plaintiff was able to heel/toe walk and had a negative straight leg raising test. Dr. Kleeman diagnosed early disc degeneration secondary to hyperextension or overuse or posturing due to her knee problems (Tr. 316). He recommended physical therapy and the avoidance of excessive bending, stooping and lifting (Tr. 316).

In September 1992, Dr. Kleeman saw Ms. Henk on two occasions for swelling in the knee (Tr. 317-318). Her explained to her that her physical therapy could not be open-ended and that he would have to establish a termination date (Tr. 318).

However, the plaintiff continued to attend physical therapy through the rest of the relevant period and beyond (Tr. 329-368). Progress notes from these sources show that in August 1992 the plaintiff felt that her legs were agile if she did not overdo (Tr. 329). Her physical therapist reported in November 1992 that

20

the plaintiff continued to have pain in both knees with tightness and weakness (Tr. 340). Although she was able to do daily activities, she needed much rest for her knees and was unable to stand or sit for long periods (Tr. 340-341). On December 4, 1992 she complained to her physical therapist that her "knees really hurt" (Tr. 339) and one week later she said, "I have been in so much pain today. My knees have really been acting up." (Tr. 339, 343). In January 1993 the therapist noted the plaintiff continued to have pain in her lower extremities and permission was sought and received from Dr. Hodge to continue physical therapy treatment (Tr. 333, 344-345).

In March 1992 the plaintiff was referred to Alan Sheinbaum, M.D. due to a one year history of abdominal pain (Tr. 387-392). At this time the plaintiff described having attacks of stabbing pain radiating into her back and the shakes and sweats with soreness following for several days (Tr. 387, 390). Her multiple allergies to many medications was noted to include Zantac, Axid, Prilosec, penicillin, many pain killers including Demoral, as well as Ancef (Tr. 388). Laboratory testing was performed on the plaintiff but Dr. Sheinbaum could not ascertain the cause of her pain (Tr. 371-378, 389-391, 393). The most specific diagnosis that he could provide was spasm (Tr. 391).

In August 1992, x-rays were taken of the plaintiff's lumbar spine and her right knee (Tr. 394-395). The plaintiff's lumbar spine was normal and the plaintiff's right knee showed evidence only of the bone graft.

Judson Belmont, M.D., an ear, nose and throat specialist, examined the plaintiff in October 1992 for allergies (Tr. 396). He stated in a report that she was a classic multiple chemical sensitivity individual in many ways. He also noted that her overall improvement was hampered by her numerous pets and the dirt floor basement (Tr. 401). After completing a series of tests he determined she had a severe sensitivity to cats, dogs, mold, wheat, corn and chocolate (Tr. 407).

## Evidence Following The Relevant Period

Following the expiration of the plaintiff's insured status in March 1993, the medical evidence of record shows that she continued to undergo physical therapy for her knees. Therapists' comments in May 1993 reported plaintiff's complaint of painful knees with muscle tightness; in June 1993 swelling in the knees with muscle tightness; in July 1993 her knees were described as very painful, and in August 1993 she continued to have sore knees with muscle tightness (Tr. 346-347, 350).

In September 1993, Christopher Lunch, M.D., a rheumatologist and specialist in treating arthritis, began treating plaintiff for arthritis in her knees (Tr. 409). He reported she had developed early degenerative arthritis in both knees and either degenerative arthritis or degenerative disc disease in her spine (Tr. 409-412). He increased her dosage of Lodine[5] to deal with

---

[5] Lodine - A non-steroidal anti-inflammatory drug indicated for acute and long term use in the management of signs and symptoms of osteoarthritis. It is also indicated for the

22

her pain but this caused gastrointestinal side effects thus he switched her to Relafen[6] (Tr. 410).

In January 1994, a limited psychological evaluation was prepared by Paul Finn, Ph.D. (Tr. 417-420). He reviewed plaintiff's long history of treatment of the condition in her knee and other physical problems. In his report he noted that the plaintiff did some volunteer work in the morning for the Animal Rescue League although she stated that the pain caused her problems in the afternoon (Tr. 418). Dr. Finn encouraged the plaintiff, for her psychological well being, to continue her volunteer work within medical limits and try to have a structured day with activities out of the home (Tr. 418-419).

In March 1994, Mark Lewy, M.D., plaintiff's family physician, wrote a letter in which he stated he had been treating her since March 1991 and that she had experienced constant pain in her knee (Tr. 415-416). He notes her treatment for her knee had been complicated by multiple drug allergies and intolerances as well as gastrointestinal intolerance associated with most non-narcotic pain medicines (Tr. 415). She had a documented allergy to penicillin, cephalosporin, sulfa antibiotics, ciprofloxacin, Zantac, Pepcid, Axid, Cytotec, all opiates, most NSAIDS (antiarthritic medications) Hismanal and Seldane (Tr. 416). She

management of pain. The recommended dosage for acute pain and the management of osteoarthritis is 600 to 1200 mgs per day. Physician's Desk Reference, p. 2743-2748, 50th Ed. (1996).

[6] Relafen - Indicated for acute and chronic treatment of signs and symptoms of osteoarthritis and rheumatoid arthritis. Physician's Desk Reference, p. 2511, 50th Ed. (1996).

could only tolerate Lodine 300 mg. twice per day which was less than the recommended dosage (Tr. 416). (See, footnote 2 supra).

Mary Derepentigny, a physical therapist, stated in a March 1994 note that she had been providing physical therapy treatment to plaintiff for the past year and one half (back to October 1992) (Tr. 319). She reported she observed plaintiff come in for treatments in extreme bilateral pain with body fatigue and obvious patella swelling as well as cervical tightness (Tr. 319). However, she did note that the plaintiff responded well to massage. Ms. Derepentigny opined that because of the intense pain and stress Ms. Henk tended to compensate for her bilateral leg weakness with overuse to her upper extremities thus explaining her cervical tightness (Tr. 319).

Plaintiff was next examined by Hoke Shirley, M.D., a pain specialist, in October 1994 (Tr. 422-425). Dr. Shirley reported her medical problem to be osteoarthrosis[7] of the right knee with substantial patellofemoral pain and with evidence of diffuse soft tissue pain without evidence of an inflammatory arthropathy (Tr. 424). Physical examination showed some mild point phenomenon with bilateral crepitus, but a full range of motion and normal pulses. X-rays of the right knee revealed the residual of the Maquet[8] procedure, some mild degenerative changes and mild to

---

[7] Osteoarthrosis - The same medical condition as osteoarthritis which is defined as degenerative joint disease. Stedman's Medical Dictionary, p. 1002, 24th Ed. (1982).

[8] Maquet - Defined as anterior tibial tubercle plasty for chondromalacia. Coding Procedures & Terminology, #27418, Coding Reference Book (St. Anthony Publishing Co., 1993).

moderate patello-femoral degenerative changes (Tr. 424). He went on to state she did have soft tissue pain syndrome probably a secondary phenomena to all her other stressors, particularly her right knee (Tr. 424).

In October 1994, John J. O'Connor III, M.D., also examined the plaintiff (Tr. 425). He noted Ms. Henk had seven arthroscopic procedures on her right knee, a Maquet procedure and then a revision of the Maquet because of loud snapping (Tr. 425). Since these nine procedures, she continued to complain of persistent snapping in the knee with diffuse excruciating pain (Tr. 425). The entire knee was described as very sensitive. At night when she slept, the plaintiff stated that she had to lie with her leg over the side of the bed so that nothing came in contact with the anterior surface of her knee (Tr. 425). Dr. O'Connor thought plaintiff's pain appeared to be out of proportion to the physical findings and x-rays (Tr. 425). Thus, he opined she had a soft tissue problem, most likely RSD[9], given the hypersensitivity in the knee (Tt. 425).

In September 1994, Michael Mittelman, M.D., diagnosed plaintiff with psoriasis related to her arthritis (Tr. 426-431).

Ralph Beasley, M.D., examined plaintiff in November 1994 and prepared a comprehensive consultative report (Tr. 383-386). His

---

[9] Reflex Sympathetic Dystrophy - Diffuse superficial and deep burning pain in an extremity associated with vasomotive disturbances, trophic changes and limitation or immobilization of joints as the result of some local injury. Stedman's Medical Dictionary, p. 437, 24th Ed. (1982). Trophic changes is defined as relating to or dependent upon nutrition and as resulting from interruption of nerve supply. Id. at p. 1490.

25

examination revealed multiple trigger points and tender points throughout her body (Tr. 385). Further physical evaluation showed adequate sensation, good pulses and only slightly decreased strength in the right ankle. His assessment was that she had a complex pain situation with multiple etiologies (Tr. 385-386). He opined there was a reasonable possibility she had RSD and he decided to move forward with treatment of this medical condition in order to address her pain (Tr. 386). He also opined a diagnosis of probable fibromyalgia, probable apparent psoriatic arthritis and question of lupus (Tr. 386). In a pain management progress note from January 1995, Dr. Beasley indicated that while the presence of RSD was raised prior to 1992, treatment for this condition had been limited to physical therapy and massage (Tr. 450). Plaintiff's subjective complaints included throbbing, pulsating pain in the right knee, as well as burning pain in the knee which had spread to involve the left knee, and some burning in her hands and wrists, with swelling in her hands and legs (Tr. 450). She had periodic leg spasms, feet that were cool and at times numb and periodically gray in color (Tr. 450). He also mentioned that her examination in November 1994 was consistent with fobromyalgia (Tr. 450). Plaintiff was discharged from the pain management program without being given any medications or undergoing any procedures (Tr. 450).

Acknowledging that he had only seen the plaintiff on one occasion (November 1994) for an examination, Dr. Beasley offered an opinion as to her residual functional capacity ("RFC") for the

26

prior couple years in an assessment dated February 11, 1995 (Tr. 459-468). This opinion was based on that examination and review of limited medical records of Dr. Shirley, Dr. Hodge, Dr. O'Connor and Dr. Finn (Tr. 463). He stated:

> My history and exam would confirm RSD as one of her components of her chronic intractable pain syndrome. This is based upon autonomic sympathetic nervous system changes of color, changes (of) swelling, burning pain, allodymia. RSD can involve muscles and may spread to involve the whole body. As of yet I cannot determine (and I may not be able to determine) if all of her pain can be explained by RSD or if there are multiple factors, diagnoses responsible for her chronic intractable pain. Clearly by history RSD has existed since 1991 and pain has spread to involve her back in 1992 and extremities in 1993. I feel she is disabled from work and has been for some years. I agree volunteer work is helpful as does Dr. Finn without the physical time demands a regular job would require. (Tr. 463).

Dr. Beasley also stated that the plaintiff's ability to lift, carry, walk, sit, stand, reach, handle, push and pull were all affected by her impairment (Tr. 459-461). However he did not specify to what degree these activities were impaired.

Also on February 11, 1995, Dr. Beasley also completed an RFC questionnaire for fibromyalgia for the period January 1992 to March 1993 (Tr. 464-468). He noted Ms. Henk had a number of symptoms of fibromyalgia including multiple tender points, non-restorative sleep, chronic fatigue, subjective swelling and frequent, severe headaches (Tr. 464). He further indicated Ms. Henk's ability to maintain attention and concentrate, deal with work stress, walk, sit and stand was markedly limited by this condition (Tr. 465-466, 468).

27

Ronald Szopa, D.M.D., Ms. Henk's dentist, stated he had treated her since October 1991 (Tr. 476). He reported she had experienced a variety of dental problems that could easily be the result of her clenching her jaw while she was in pain (Tr. 476).

B.   Brenda Henk's Testimony (Second Hearing - February 15, 1995)

The plaintiff testified regarding her physical condition during the period January 1992 to March 1993 (Tr. 51-52). She complained of continuing severe pain in her right knee along with pain in her left knee, lower back, hands, right hip and shoulder (Tr. 52). Her day began by taking her Lodine 45 minutes before she got out of bed to bring her daughter to school (Tr. 52). She explained how she had tried other stronger medication (Voltaren, Naprosyn, Motrin) but she ended up ill or in the emergency room of Concord Hospital[10] because of an allergic reaction (Tr. 53).

Plaintiff related how her treating physician for her condition changed from Dr. Kleeman to Dr. Hodge to Dr. McCarthy and Dr. Lynch (Tr. 53-55). A referral was made by her family physician, Dr. Lewy, to Dr. Lynch, a rheumatologist, in August 1992 because she was incapacitated at times with pain and swelling (Tr. 55). Some days she wouldn't get out of bed because of the pain and she didn't want to go down the stairs (Tr. 55). On other days when she felt better she would go grocery shopping but then sit in her car 20 minutes trying to get the courage to

_____

[10]   Plaintiff was treated at the hospital several times during the relevant period for allergic reactions to medication. (Tr. 197, 370, 371, 381).

28

go up the stairs to go back into her house (Tr. 55). Dr. Lynch prescribed 500 milligrams Relafen for her pain and discomfort but after a day and a half she could no longer tolerate the pain in her stomach caused by this mediation (Tr. 60). Dr. Lewy advised her to return to taking Lodine which she was still taking on the day of her hearing (Tr. 60).

Plaintiff described the pain back in 1992 to be excruciating in her right leg when she put weight on it (Tr. 56). She further described it as a throbbing, pulsating ache (Tr. 56). She also mentioned the snapping in her knee that occurred three or four times a week which caused her to lose her balance and on some occasions to fall (Tr. 56-57). To protect herself from falling outside on ice in the winter she used a cane with a grabber at the bottom (Tr. 58-59). This was prescribed by Dr. Kleeman in 1990 (Tr. 58).

Plaintiff also explained that she required treatment for her teeth (repair of bridgework and removal of one eye tooth) because of the affects of severe teeth clenching caused by the chronic pain in her knee (Tr. 60-61). She explained that she apparently was doing this in 1992 and 1993 but didn't realize it until her teeth required treatment by her dentist (Tr. 61). Because she had a history of sinus infections, she attributed the dental pain to the sinus infections, like those that Dr. Lewy had treated her for in 1991 and 1992 (Tr. 62).

Plaintiff testified that Dr. Sheinbaum treated her in 1993 for abdominal pain (Tr. 63). After having an endoscopy without

the aid of any type of anesthesia (because of allergies to opiates) and after having other tests performed, Dr. Sheinbaum discovered she could not tolerate more than 600 milligrams per day of Lodine (Tr. 64-65). If she took more, it would affect her liver (Tr. 65). Plaintiff also testified that she had had pancreatitis in 1992 and 1993, and through the date of the hearing, which caused intense pain in the stomach area (Tr. 65).

Plaintiff explained her involvement in some activities outside her home and the fact that they ceased around the end of 1992 (Tr. 66). She tried to be involved in these activities because she felt kind of useless doing nothing (Tr. 66).

She had participated in the Animal Rescue League and, when she felt up to it, she would go to a classroom and speak to students about cats or dogs (Tr. 66). This activity lasted a total of two hours from the time she brought the animal to school until the time she returned the animal and occurred not more than once a month (Tr. 66-67). After performing this activity she needed to recuperate at her home on her couch for two or three days with her leg elevated (Tr. 67). This type of activity was encouraged by her treating doctors for her self esteem (Tr. 67). Dr. Finn told her it was important that she do things to stop her from feeling worthless (Tr. 68-69).

Plaintiff testified that her involvement with activities at her daughter's school had steadily declined over the years (Tr. 74). She was rarely at the school any more and just provided assistance on a consulting basis (Tr. 74-75). In 1992 and 1993

30

she was still bringing her daughter to school, unless she wasn't physically up to it, but it was at that point she began putting programs in place because she realized she could not stay there on a daily basis (Tr. 75, 83).  She had a mailbox at the school and she would respond to any questions that were in the box related to the volunteer program (Tr. 75).  As to involvement with the Junior Women's Club, that had ceased in May 1992 after her term as president expired (Tr. 76, 83).

Plaintiff testified she had a problem sleeping at night going back to when she had her bone graft in 1990 (Tr. 69-70).  She experienced spasms in her legs at night that prevented her from sleeping (Tr. 70).  She opined these spasms were caused by her changed method of walking to avoid stress and pain on her knee (Tr. 70).  To alleviate the pain she would get up and soak in a hot bath tub (Tr. 70).

Michael Henk, her husband, also testified at this hearing (Tr. 78-81).  He stated that after her major surgery in 1990 life slowed down dramatically for the family (Tr. 78).  They couldn't do as many things as a family, e.g., vacations, and he and his daughter had to do more to help out, i.e., shopping, cooking, and laundry (Tr. 78).  He indicated that he did not know if her involvement in 1991 and 1992 with the Junior Women's Club was terribly physical and that she would participate in organizing a function if she felt well enough but she, for the most part, was not actually involved in the activity or event (Tr. 79).  Finally, Mr. Henk testified that going back to 1991 there were

31

times when his wife would not be able to negotiate the stairs to the bedroom because of muscle spasms and thus would sleep on the couch (Tr. 80-81).